**CITY OF HIDALGO and Ruben De Leon, Appellants,**

v.

**Francisco PRADO, Adan Gomez, Manuel Martinez, and Noel Borrego, Appellees.**

No. 13–98–596–CV.

Court of Appeals of Texas, Corpus Christi.

June 24, 1999.

J. Arnold Aguilar, Law Office of J. Arnold Aguilar, Brownsville, D. Wilkes Alexander, Roerig, Oliveira & Fisher, L.L.P., Brownsville, for Appellants.

Jose Antonio Gomez, Edinburg, for Appellees.

Before Justices DORSEY, HINOJOSA, and RODRIGUEZ.

**O P I N I O N**

Opinion by Justice HINOJOSA.

Appellees, Francisco Prado, Adan Gomez, Manuel Martinez, and Noel Borrego, are former City of Hidalgo police officers. They each sued appellants, the City of Hidalgo and Chief of Police Ruben De Leon, for wrongful termination and intentional infliction of emotional distress. The trial court denied appellants' motions for summary judgment which were based on a claim of official immunity.[1] Appellants each raise two issues challenging the denial. We reverse and render.

### A. The Allegations

#### 1. *Francisco Prado*

Francisco Prado began working as a police officer for the Hidalgo Police Department in December 1990 and was terminated on May 5, 1991. Prado was a probationary officer at the time of his discharge. His petition alleged discharge for unjust cause and denial of a pre-termination hearing. Prado also claimed that De Leon ordered supervising officers to write him up for any reason and made statements to these officers that Prado had no business being a police officer because he was unfit for duty. He claimed De Leon ridiculed him in public to the point that working conditions were intolerable. Prado further contended De Leon used an investigation, based on the false accusation of theft from street vendors, as the basis for his termination.

#### 2. *Adan Gomez*

Adan Gomez was employed as a police officer by the Hidalgo Police Department from November 1988 until his termination on May 7, 1991. His petition alleged termination without just cause and lack of a pre-termination hearing. Gomez asserted De Leon subjected him to public harassment, intimidation, and ridicule, thus making working conditions intolerable. Because De Leon allegedly wanted to discharge Gomez, he instructed supervising

---

1. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(5) (Vernon Supp.1999) (permitting interlocutory appeal from the denial of a mo-tion for summary judgment based on assertion of official immunity).

officers to document everything Gomez did. Gomez contended De Leon recommended him for several unpaid suspensions which were successfully appealed.

### 3. *Manuel Martinez*

Manuel Martinez was an Hidalgo police officer from December 1988 until he resigned on August 24, 1991. He alleged wrongful constructive discharge because of De Leon's harassment, intimidation, and ridicule. Martinez claimed De Leon asked him to spy on other officers slated for termination and to report any misconduct he observed. Martinez refused this request. He contended De Leon then ordered supervising officers to document all his shortcomings in order to build a case for termination. On August 12, 1991, Martinez signed a letter of "no confidence" against De Leon.

### 4. *Noel Borrego*

Noel Borrego began working as a police officer with the Hidalgo Police Department in April 1990. He was promoted to the position of probationary sergeant for a period of six months on March 29, 1991, and demoted on August 15 of that year. Borrego resigned on August 24, 1991. He alleged wrongful constructive discharge caused by De Leon's public and intolerable harassment, ridicule, and intimidation. Borrego claimed that approximately May 1991, De Leon ordered him to write up certain officers, even for insignificant conduct. After receiving complaints from other officers about De Leon's unprofessional conduct, Borrego drafted and signed a letter of "no confidence" against De Leon on August 12, 1991. Borrego contended that De Leon responded by ordering Borrego's supervisor to find a reason for demotion.

### B. PROCEDURAL HISTORY

The City and De Leon answered separately, denying all of appellees' allegations and raising various affirmative defenses. At appellants' requests, the trial court consolidated the four cases. The City's first motion for summary judgment, sought on several grounds, was denied. De Leon then moved for summary judgment against each of the appellees, in part on the ground of official immunity. The City filed a second motion for summary judgment claiming its entitlement to sovereign immunity derived from De Leon's official immunity. The trial court denied both motions. Appellants filed this appeal under section 51.014(a)(5) of the civil practice and remedies code. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(5) (Vernon Supp. 1999).

### C. STANDARDS OF REVIEW

When a defendant relies on an affirmative defense in seeking a summary judgment, the proper inquiry on appeal is whether the defendant fulfilled his initial burden to establish his affirmative defense to the plaintiff's cause of action as a matter of law. *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant must be taken as true, every reasonable inference must be indulged in favor of the non-movant, and any doubts resolved in his favor. *Nixon,* 690 S.W.2d at 549.

Governmental employees, such as Chief De Leon, have official immunity for the performance of discretionary duties performed in good faith as long as they are acting within the scope of their authority. *See City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex.1994); *City of Pharr v. Ruiz,* 944 S.W.2d 709, 712 (Tex.App.—Corpus Christi 1997, no writ). An official is protected by immunity whether his conduct was negligent or a mistaken exercise of public duties. *Harris County v. Ochoa,* 881 S.W.2d 884, 888 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *Vasquez v. Hernandez,* 844 S.W.2d 802, 804 (Tex.

App.—San Antonio 1992, writ dism'd w.o.j.).

A discretionary duty involves personal deliberation, decision, and judgment as opposed to a ministerial act which requires obedience to orders. *Chambers,* 883 S.W.2d at 654; *Ruiz,* 944 S.W.2d at 713. The issue is whether the person was performing a discretionary function, not whether the person had discretion to act in a certain manner. *Chambers,* 883 S.W.2d at 653; *Ruiz,* 944 S.W.2d at 713. An official's decision to reprimand or terminate an employee requires personal deliberation and judgment and is, therefore, a discretionary function. *City of Palestine v. Ramirez,* 925 S.W.2d 250, 253 (Tex.App.—Tyler 1996, no writ). Such a decision involves an ongoing analysis that includes investigating possible wrongful conduct, determining the severity of the alleged act, and deciding on the appropriate punishment, if required. *Id.*

Good faith in official immunity cases must be measured against a standard of objective legal reasonableness, without regard to the officer's subjective state of mind. *Chambers,* 883 S.W.2d at 656. We consider whether reasonable officials could have believed their conduct was justified based on the information possessed by the officials and the established law at the time of the conduct. *Id.; Ruiz,* 944 S.W.2d at 713. To controvert this element, the non-movant must establish that no reasonable official in the movant's position could have believed the conduct was justified. *Chambers,* 883 S.W.2d at 657.

Officials act within the scope of their authority if they are discharging the duties generally assigned them. *Chambers,* 883 S.W.2d at 658. Even if the action is wrong or negligent, the official still acts within the scope of his authority. *Medina County Com'rs Ct. v. The Integrity Group, Inc.,* 944 S.W.2d 6, 9 (Tex. App.—San Antonio 1996, no writ); *Koerselman v. Rhynard,* 875 S.W.2d 347, 350 (Tex.App.—Corpus Christi 1994, no writ). Hiring, firing, and reprimanding police officers is generally within the scope of the authority of the police chief. *See Ramirez,* 925 S.W.2d at 252–53.

Where an employee is protected from liability under the doctrine of official immunity, the governmental entity's sovereign immunity remains intact. *See City of Houston v. Kilburn,* 849 S.W.2d 810, 812 (Tex.1993); *Murillo v. Vasquez,* 949 S.W.2d 13, 17 (Tex.App.—San Antonio 1997, writ denied).

### D. DE LEON'S MOTIONS FOR SUMMARY JUDGMENT

By his first issue, De Leon contends the trial court erred in denying his motions for summary judgment against each one of the appellees because he is entitled to official immunity.

Summary judgment evidence included affidavits from De Leon and Hidalgo's current chief of police, Vernon Rosser, as well as the depositions and interrogatory answers of the appellee addressed by each motion. Rosser's affidavit was based on personal knowledge and stated that he had read all of appellees' pleadings and was familiar with the allegations. Rosser was a lieutenant when De Leon was chief of police. According to Rosser, all of the acts alleged by appellees against De Leon were within the chief's scope of authority, requiring personal deliberation, decision, and judgment. Rosser stated that the acts were justified and that any reasonable official in the same or similar circumstances would have so believed given the established law and the information possessed at the time.

De Leon's affidavit was similar to Rosser's. De Leon was familiar with appellees' pleadings and read their depositions.

### 1. *Prado's Deposition*

Prado testified by deposition that he was a probationary officer and was terminated because he did not meet the minimum

standards required for the position. Prado claimed De Leon falsely accused him of being unfit and that he was never written up or evaluated before the termination. On March 19, 1991, De Leon asked Prado to respond in writing to a complaint that he had stolen candy and gum from young vendors at the Hidalgo International Bridge. Prado denied the allegation, and De Leon assigned Lieutenant Rosser to conduct an internal investigation.

Rosser obtained statements from several Hidalgo police officers and at least one citizen, which contradicted Prado's denial. One officer reported that McAllen police officers working at the bridge saw Prado take the candy and gum. The same officer talked with the young vendors and learned that they feared Prado because he grabbed them by the neck, shook them, and took their candy. On April 10, Rosser submitted a written report to Chief De Leon that Prado had admitted using poor judgment in confiscating the items and in lying to the chief about his conduct. Rosser recommended that Prado receive a verbal reprimand.

In his deposition, Prado denied admitting to Rosser that he had used poor judgment, but admitted that he "confiscated" the gum and candy because the vendors were obstructing traffic. Prado also admitted that no law allowed him to confiscate the items for such an offense or permitted him to keep the confiscated items for his own use. Prado admitted he was not terminated for this incident.

Near the end of April 1991, De Leon confronted Prado about his providing information to the subject of an investigation that could possibly put investigators and their families in jeopardy. Prado denied the accusation, and De Leon ordered him to talk to Rosser about the situation, which Prado failed to do. At the beginning of May, De Leon again confronted Prado and asked him what he was going to do about the matter. Prado said he would not do anything; and De Leon handed him the letter of termination. Prado then request-ed a due process hearing and was informed by the city manager that, under city policies and procedures, a probationary officer was not entitled to a termination hearing.

Other than the allegation that De Leon falsely accused him of failing to satisfy the minimum job requirements, Prado could express no other false statements attributed to De Leon. He said De Leon ordered supervising officers to make him rewrite his reports, but he did not claim the reports were adequate as originally drafted. Although Prado complained that fellow officers were ordered to write reports about his conduct, he did not claim the reports were false. He noted a department policy, created shortly after he began working for the department, that barred personnel from using personal cell phones or beepers while on duty. Prado apparently felt the policy was aimed at him, but admitted that while he was on duty, he used his personal cell phone for personal calls and to conduct business at his car dealership.

## 2. Gomez's Deposition

Gomez claimed he was wrongfully terminated. Gomez testified by deposition that he was terminated for using excessive force in capturing a vendor at the Hidalgo International Bridge and for falsifying the subsequent report. On May 6, 1991, Gomez was pursuing a vendor suspected of trying to sell a gold chain at the bridge. Gomez slipped but caught the vendor anyway. The vendor and several officers, including De Leon, reported that Gomez hit and kicked the vendor in the stomach/groin area. Gomez denied assaulting the vendor. He said he had not seen one of the witnesses in the area and believed the officers would falsify their reports.

Two officers reported that Gomez had said he messed up when he hit the vendor because he had forgotten De Leon was present. Gomez said he did not remember making the statement and claimed one of the officers was likely to falsify his report.

When it was noted that part of Gomez's report of the incident could be interpreted to mean that De Leon ordered him to strike the vendor, Gomez disagreed. Gomez was terminated on May 7 for the reasons set forth above.

Prior to this incident, Gomez had missed a mandatory meeting on or about April 22, 1991. Gomez said it was his day off, and he had just forgotten. Gomez was given a three-day suspension for missing the meeting. Gomez appealed the suspension and termination to the city manager. A due process hearing was held, and the three-day suspension was overruled by the city manager. However, because neither Gomez nor his counsel would state Gomez's version of the incident with the vendor, the city manager affirmed the termination.

Gomez believed De Leon was hired by the City of Hidalgo to clean up the police department. For that reason, Gomez believed he was targeted for termination from January 1991. Gomez claimed his supervising officer was ordered to pressure him to quit, but he provided no evidence of the pressure that was exerted.

### 3. *Martinez's Deposition*

Martinez testified by deposition that he was targeted for termination. As proof, he claimed: (1) false accusations were made against him, (2) he was written up for everything, (3) he was ridiculed, (4) he was sent to Mexico to drive stolen vehicles that had been recovered by Mexican police back to Hidalgo, (5) he refused to spy on other officers, and (6) he was given a reprimand for not having a home telephone.

Martinez claimed he was falsely accused of misplacing evidence. He admitted not following police department procedure for logging and storing evidence. Martinez admitted he was temporarily unable to locate the misplaced evidence, but he claimed De Leon moved the evidence after it was improperly stored in a desk, while Martinez was out of the office. In late July 1991, Sergeant Borrego reported Martinez's failure to follow police depart-

ment procedure and recommended he be given a three-day suspension. Martinez stated that Borrego would not falsify a report, he did not know if De Leon told Borrego what to write, and he did not know if De Leon suggested the suspension be included in the report. Martinez could recall no other false accusations made by De Leon.

Martinez claimed De Leon put his life in jeopardy by sending him into Mexico to return stolen cars to the United States. He admitted, however, that he never confronted an accused, made an arrest, or carried a gun while in Mexico. All vehicles returned by Martinez were first recovered by Mexican officials. Martinez merely went into Mexico and drove the cars back to Hidalgo. In most instances, Martinez simply walked to where the vehicles were located in Mexico because they were parked just across the international bridge from Hidalgo.

According to Martinez, De Leon constantly referred to Hidalgo police officers as "burros" and said they could do nothing for themselves. He also did things such as throwing raincoats to the ground, embarrassing Hidalgo police officers in front of other law enforcement officers. Martinez admitted these actions were not aimed solely at him. However, he claimed he was asked by De Leon to spy on other officers and report violations of department policies. Martinez refused to do this. De Leon did not ask him to fabricate violations. Martinez claimed Sergeant Borrego said he was asked to document every error Martinez made. Martinez did not hear De Leon give this order, and Borrego was not told to lie.

Near the end of July 1991, Sergeant Borrego instructed Martinez to install a telephone in his home so the department could reach him if he was needed. Martinez did not comply, and Lieutenant Rosser wrote a report recommending a one-day suspension. De Leon overruled the recommendation.

On July 30, Martinez responded to Rosser's call for an officer to issue a ticket. Rosser was working a task force assignment, and department policy provided that officers on such an assignment would not issue tickets, but would call for a patrol unit. Rosser had stopped a vehicle because no motor vehicle inspection sticker was displayed on the windshield. Upon further investigation, Rosser discovered the driver did not have a driver's license. He told Martinez to issue a warning for the missing sticker and to cite the driver for not having a driver's license. As Rosser walked back to his duty post, he noticed Martinez close his ticket book without issuing the citations. Rosser asked Martinez why he was not complying with his instructions, and Martinez said a passenger, who had a driver's license, was going to drive the car. Rosser again instructed Martinez to write the citations. When Martinez refused to comply, another officer issued the citations. Rosser gave De Leon a written report of the incident and recommended that Martinez be given a seven-day suspension. De Leon agreed with the recommendation.

Martinez testified he refused to issue the tickets because he had not actually seen the unlicensed person drive. He believed that issuing the citations was illegal. He admitted he did not tell Rosser that he had such a belief. Martinez further admitted he had previously issued tickets when he had not witnessed an offense.

On August 12, 1991, Martinez signed a letter of "no confidence" against De Leon. The next day he was suspended for ten days; three for failing to follow police department procedure in handling evidence. and seven for refusing to comply with a superior officer's order. He was not suspended or terminated for signing the "no confidence" letter. On August 24, 1991, Martinez resigned from the department. One year later, when Martinez obtained his personnel files from the department, he learned he would have been terminated upon his return from the ten-day suspension.

Martinez claimed the Mission Police Department refused to hire him after De Leon told someone in Mission that Martinez was not a team player. He admitted, however, that no one from Mission ever told him this was the reason for his rejection or that De Leon had made such a statement. Martinez admitted that he and others may have speculated this was the reason.

### 4. *Borrego's Deposition*

Borrego testified by deposition that he was promoted to the position of Sergeant on De Leon's recommendation. He said De Leon told him to document Gomez and Martinez, and occasionally Prado, for policy violations and for having to rewrite poorly written reports. Borrego was the supervising officer for these men. De Leon did not ask Borrego to falsify his reports. He admitted it was not unusual for a police department to expect high quality performance from its officers and it was not wrong to expect better written reports.

Borrego claimed he received many complaints concerning De Leon's unprofessional conduct. He talked to Lieutenant Rosser, the city manager, and the city commissioners about the complaints, but he did not wait for a response. On August 12, 1991, Borrego drafted a "no confidence" letter against De Leon and solicited signatures from Hidalgo police officers. He also notified the news media of the letter. On August 15, Borrego received a letter from Rosser that he had violated five departmental policies by drafting the letter and going to the news media. According to the letter, Borrego violated departmental policy by: (1) soliciting signatures from Hidalgo police officers during his work hours; (2) bypassing the chain of command by taking the "no confidence" letter directly to De Leon instead of giving it to Rosser; (3) violating the grievance procedure by failing to immedi-

ately notify his superior of a complaint; (4) signing a petition when departmental policy barred such action; and (5) going to the news media about a departmental matter without authority. Rosser recommended that Borrego be demoted back to a patrol officer. De Leon concurred.

Borrego admitted he drafted the letter and solicited signatures while he was on duty, and that he did not give the petition to Rosser before giving it to De Leon. He admitted not immediately notifying Rosser of the officer's complaints, and that he did not put the grievances in writing. Borrego admitted he was not sure of departmental policy, claimed the letter was not a petition, and denied the policy precluded him from going to the news media with an internal matter. After his demotion on August 15, Borrego again went to the news media. On August 24, 1991, Borrego resigned from the department. When he obtained his personnel records one year later, Borrego learned that a termination letter had been drafted on August 16, after he defied Rosser's instructions not to go to the news media. Borrego was not suspended between the 15th and 24th of August. He claimed he resigned because he could not stand De Leon's attitude. He could not recall if he appealed his demotion, but admitted an appeal was not automatic, it had to be requested.

Borrego assumed De Leon told Rosser to recommend the demotion, but there was nothing in the letter to indicate this occurred. Borrego had no knowledge of De Leon's involvement. Borrego had no knowledge that De Leon ever said anything to prevent him from getting subsequent employment.

### 5. *Analysis*

█ Each instance complained of by appellees related to personnel actions. De Leon was either directly or indirectly involved in these actions at some level. He gave statements regarding conduct he observed which violated department policy, reviewed reports written by others, had allegations against officers investigated, created departmental policies, instructed supervising officers to document deficiencies, and decided whether recommended disciplinary actions were warranted. De Leon hired, fired, and terminated officers subject only to grievance and appeals procedures. After reviewing the record and case law, we conclude, as De Leon and Rosser state in their affidavits, that the acts complained of are within De Leon's scope of authority and were discretionary functions.

█ We also hold De Leon's conduct was done in good faith. Much of the behavior described by appellees, such as yelling and name calling, portrays De Leon as an irascible individual. However, in each instance, the terminations or discipline that led to resignations can be attributed to appellees' conduct.

Prado, a probationary officer, was terminated when he refused to comply with a directive from De Leon. In addition, he had confiscated and kept for himself, candy and gum from vendors at the Hidalgo International Bridge when the offense the vendors were accused of committing did not permit the confiscation. When De Leon asked about the incident, Prado lied.

Gomez was terminated because multiple witnesses reported his use of excessive force in apprehending an individual at the bridge. He then apparently falsified his report of the incident by claiming De Leon ordered him to strike the individual.

Martinez was suspended because he did not follow departmental procedure for handling evidence and for insubordination. Had he returned to work rather than resigning, he would likely have been fired.

Borrego was demoted for violating five departmental policies when he initiated the "no confidence" letter and then went to the news media with the information. He was subject to termination after he defied a directive and went to the news media a second time. He resigned before such action was taken.

As De Leon and Rosser stated in their affidavits, a reasonable person in De Leon's position could have believed the conduct at issue was justified. We hold De Leon has established his entitlement to official immunity.

### 6. *Appellees' Response*s

■ Once the movant for summary judgment establishes an affirmative defense which would bar the suit as a matter of law, the non-movant must produce summary judgment proof raising a fact issue in avoidance of the affirmative defense. *Gonzalez v. City of Harlingen,* 814 S.W.2d 109, 112 (Tex.App.—Corpus Christi 1991, writ denied). Thus, we now look to appellees' summary judgment responses.

■ Appellees filed responses to De Leon's motions for summary judgment. They challenged technical errors in De Leon's evidence which were corrected by subsequent amended motions. They also contended De Leon's and Rosser's affidavits were not proper summary judgment evidence because they were from interested parties, not readily controvertible, and conclusory. We disagree.

Summary judgment evidence may be provided by interested parties if it is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX.R. CIV. P. 166a(c). De Leon and Rosser each state their affidavits are based on personal knowledge. Obviously De Leon would have knowledge of the acts alleged, and nothing in the record controverts Rosser's knowledge. In fact, the record reflects Rosser was directly involved in much of the conduct at issue. Rosser based his conclusion, that De Leon is entitled to official immunity, on appellees' pleadings. De Leon also relied on appellees' depositions. De Leon and Rosser clearly stated that *all* acts alleged in those documents were within De Leon's scope of authority, discretionary, and done in good faith. The affidavits could have been readily controverted by evidence showing why no reasonable person would have believed the alleged acts were done in good faith or by controverting the scope of authority and discretionary function prongs.

Attached to each response was Borrego's affidavit. Although he stated no reasonable person would have believed De Leon's conduct was justified, he does not explain how he is qualified to make that determination. The reasonable person must be one in the same or a similar situation. Borrego makes no claim that he has ever had to discipline or terminate an employee. Instead, he merely points out conduct he believed was unjust and claims the discipline imposed by De Leon was based on fabricated or exaggerated information. We hold this is not sufficient to controvert De Leon's proof of good faith and does not address the scope of authority or discretionary function prongs.

Because appellees did not produce summary judgment proof raising a fact issue in avoidance of the affirmative defense of official immunity, we hold the trial court erred in denying De Leon's motion for summary judgment. We sustain De Leon's first issue.

### E. THE CITY'S MOTION FOR SUMMARY JUDGMENT

■ By its first issue, the City of Hidalgo contends the trial court erred in denying its second motion for summary judgment because it has sovereign immunity derived from De Leon's official immunity. We agree. If the employee is protected from liability under the immunity doctrine, then the governmental entity is also immune from liability. *Kilburn,* 849 S.W.2d at 812. Accordingly, we sustain the City of Hidalgo's first issue.

In light of our disposition, it is not necessary to address De Leon's second issue and the City of Hidalgo's second issue. TEX.R.APP. P. 47.1.

We reverse the trial court's order denying De Leon's motions for summary judg-

ment. We grant De Leon's motions for summary judgment and render judgment that appellees, Francisco Prado, Adan Gomez, Manuel Martinez, and Noel Borrego, take nothing by their suit against appellant, Ruben De Leon.

We reverse the trial court's order denying the City of Hidalgo's second motion for summary judgment. We grant the City of Hidalgo's second motion for summary judgment and render judgment that appellees, Francisco Prado, Adan Gomez, Manuel Martinez, and Noel Borrego, take nothing by their suit against appellant, the City of Hidalgo.